IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| MAJA STEELE, § | |
| § | |
| *Plaintiff*, § | |
| vs. § | CIVIL ACTION NO. _____ |
| § | |
| SABINE VALLEY REGIONAL § | |
| MHMR CENTER d/b/a § | |
| COMMUNITY HEALTHCORE, and § | |
| INMAN WHITE, in his § | |
| Individual and official capacities, § | |
| § | |
| *Defendants*. § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff, MAJA STEELE, complains of Defendants, SABINE VALLEY REGIONAL MHMR CENTER d/b/a COMMUNITY HEALTHCORE, and INMAN WHITE, as follows:

**I.**

**Parties**

1. Plaintiff, Maja Steele, is an individual residing in Rusk County, Texas. At all relevant times, she was a public employee of Community Healthcore.

2. Defendant, Sabine Valley Regional MHMR Center d/b/a Community HealthCore ("CHC" or Community Healthcore), is a publicly supported, mental and intellectual disability governing authority for Bowie, Cass, Gregg, Harrison, Marion, Panola, Red River, Rusk and Upshur Counties with its principal office located in Gregg County, Texas. It may be served with citation by serving Inman White, CHC's Executive Director at 107 Woodbine Place, Longview, Texas 75601.

3. Defendant, Inman White, is an individual defendant and CHC's Executive Director. He may be served with process at his place of business, 107 Woodbine Place, Longview, Texas 75601.

## II.

## Jurisdiction and Venue

4. This Court has jurisdiction over Ms. Steele's claims under 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Ms. Steele's Texas Whistleblower Act claims under 28 U.S.C. § 1367 because these claims are so related to her federal claims that they form part of the same case and controversy. The factual bases of Ms. Steele's Texas Whistleblower Act claims, which support jurisdiction, are detailed in the paragraphs below and incorporated here by reference.

5. A substantial portion of the acts and omissions giving rise to Ms. Steele's claims occurred at CHC's location in Kilgore, Gregg County, Texas. Venue is proper in this district and division under 28 U.S.C. § 1391.

## III.

## Background Facts

6. This case involves defendants' violations of Ms. Steele's rights under the Texas Whistleblower Act, and the deprivation of her Constitutional rights to Free Speech.

7. The Texas Department of State Health Services (DSHS) oversees and regulates Local Mental Health Authorities (LMHA's). The Texas Administrative Code contains various regulations governing LMHA's – including, but not limited to, provisions requiring that LMHA's provide services in facilities that are "safe, sanitary, and free

from hazards."[1] DSHS also provides facility standards in its contracts with LMHA's. For example, DSHS requires, in its LMHA provider contracts, that Extended Observation Units are "free from accumulations of dirt, rubbish, dust and hazards." DSHS has the power to enforce these regulations and contractual provisions.

8. CHC is the LMHA for Bowie, Cass, Gregg, Harrison, Marion, Panola, Red River, Rusk and Upshur Counties. Its principal office is located in Gregg County, Texas. White has served as CHC's Executive Director during the violations of Ms. Steele's rights.

9. CHC employed Ms. Steele for thirteen years before unlawfully terminating her employment effective November 1, 2016. Before this termination, Ms. Steele was a licensed therapist and plan coordinator for CHC in its Regional Crisis Response Unit ("RCRC") located in the Allegiance Specialty Hospital in Kilgore, Texas. Ms. Steele was responsible for intake assessment, crisis screenings, diagnosis, treatment plans, and coordination of care for patients seeking assistance from CHC.

10. Histoplasmosis is an infectious disease caused by inhaling the spores of a fungus called *Histoplasma capsulatum ("H. capsulatum")*. Histoplasmosis primarily affects a person's lungs, and the effects can range from mild flu-like respiratory symptoms to chronic lung disease resembling tuberculosis.

11. The U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, and National Center for Infectious Diseases acknowledge that exposure to bat manure (or guano) causes histoplasmosis. Unlike birds, bats can become infected with *H. capsulatum*,

---

[1] 25 Texas Admin. Code § 412.312.

and excrete the organism in their droppings. Once a roosting sight has been discovered in a building, exclusion plans should be made, and the extent of contamination should be determined. Areas known or suspected of being contaminated by *H. capsulatum,* such as attics or even entire buildings that contain accumulations of bat guano, should be posted with signs warning of the associated health risk. Consequently, before an activity is started that may disturb any material that might be contaminated by *H. capsulatum*, workers should be informed in writing of the personal risk factors that increase an individual's chances of developing histoplasmosis.[2] Such a written communication should include a warning that individuals with weakened immune systems are at the greatest risk of developing severe and disseminated histoplasmosis if they become infected.[3] A brief inhalation exposure to highly contaminated dust may be all that is needed to cause infection and subsequent development of disease.[4] The removal of all material that might be contaminated by *H. capsulatum* from a building and immediate waste disposal will eliminate any further risk that someone might be exposed to aerosolized spores.[5] During removal of an accumulation of bat guano from an enclosed area, dust control measures should be used, but wearing a NIOSH-approved respirator and other items of personal protective equipment is also recommended to reduce further risk of *H. capsulatum* exposure.

12. On or about February 16, 2016, Good Shepherd Medical Center ("GSMC-Kilgore"), which is located in the same Allegiance Specialty Hospital building as CHC, observed 21 bats in different areas of the building and released the following statement:

---

[2] *See,* Lenhart et. al., Histoplasmosis: Protecting Workers at Risk, 2004 – Centers for Disease Control
[3] *Id.*
[4] *Id.*
[5] *Id.*

> *"Over the last several days we have experienced a number of small bats in the building housing our Kilgore Emergency Department. Bats are present in the walls and ceiling of the building, and some of the bats have migrated to our ED area. We have reduced available rooms and portions of the ED due to the bats and have been on ambulance diversion due to the reduced capacity of the facility.*
>
> *We have been working in conjunction with the City of Kilgore and Allegiance Specialty Hospital, who own and manage the building, to address the prompt removal of the bats. A wildlife expert specializing in bat removal is on site evaluating the situation and providing guidance.* ***At this time we believe it is in the best interest of our patients and our staff to temporarily cease our ER services until the situation is resolved.*** *This decision is not made lightly but is necessary for minimizing the risk of contact with the bats.*
>
> ***The safety of our staff and patients always comes first****, and we appreciate the hard work by the City of Kilgore and Allegiance to resolve the situation quickly. We anticipate the removal and cleaning process will take approximately two to two-and-a-half weeks and look forward to resuming the full spectrum of emergency care services as soon as possible."*[6] (emphasis added).

13. Unlike GSMC-Kilgore, CHC was apparently unconcerned about the health and safety of its staff (including Ms. Steele) and patients. In stark contrast to GSMC-Kilgore, CHC did not close its doors or discontinue service, although its located in the same building. CHC posted no notices in the RCRC describing the removal process, warning of histoplasmosis, or advising whether CHC's employees were at any health risk related to the presence and removal of the bat population from the building. Furthermore, CHC forbid its employees from speaking with news media or anyone else regarding the bat removal. During this same time frame, renovations (including to ventilation and ductwork) were being performed on the building. Based on information and belief, the ventilation system from the GSMC emergency department feeds into rooms occupied by CHC staff and patients.

---

[6] *See,* http://www.kltv.com/story/31237486/good-shepherd-kilgore-closes-er-due-to-bats-in-building

**Plaintiff's Original Complaint and Jury Demand – Page 5**

14. Following the bats' February 2016 removal, Ms. Steele and other CHC employees, began to experience flu-like symptoms that persisted for several months. Ms. Steele also experienced breathing difficulties, mouth ulcers, extreme fatigue, and severe headaches.

15. On October 6, 2016, concerned with her persistent symptoms, Ms. Steele questioned the CHC facility manager about the bat removal. The facility manager advised Ms. Steele that a wildlife expert removed the bats; the bat guano, however, was not removed: it had been "sprayed down." Understandably concerned, Ms. Steele began researching bat-related health risks and work-place safety. She discovered the Centers for Disease Control's guidelines referenced *infra*. Ms. Steele further learned that there is no product or chemical that is registered by the EPA that has the specific claim of being effective against *H. capsulatum,* and that a manufacturer of a product claiming to disinfect *H. capsulatum* contamination would have to meet the EPA's regulatory requirements and complete the registration process.[7]

16. On or about October 9, 2016, a GSMC employee told Ms. Steele that the bats in the GSMC portion of the building:

> *"had been coming out of the walls and air vents for a while through any opening they could get out of. They were most coming from the west side of the new wing on the second floor. They seemed to come out of the basement. We had a patient with his son in a patient room, and a bat fell from the ceiling heating/cooling vent onto the bed. It was terrible. That was when the bats were finally reported and the newspaper became involved."*

17. On or about October 10, 2016, Ms. Steele contacted Texas Department of State Health Services ("Texas DSHS") and left a voicemail regarding guano exposure at CHC for

---

[7] *Id.*

      the purpose of reporting the apparent health and safety risk to patients and staff of CHC. Unsafe or hazardous indoor air quality at a public health care facility is a very public concern.  Certain of CHC's mental health patients are vulnerable to infection, or don't have the ability to leave the facility under their own volition. On October 11, 2016, at approximately 1 pm, Ms. Steele received a call back from Jeanette Potter with Texas DSHS. Ms. Steele informed Ms. Potter about her persistent symptoms, her suspicion about exposure to *h. capsulatum* due to bats being in the ventilation system shared between GSMC-Kilgore and CHC; the lack of compliance by CHC of any recommendations published by Centers for Disease Control; the contrast between the actions taken by GSMC-Kilgore and the lack of any action taken by CHC; the need for patients and staff of CHC to enter and exit through the main hallway connecting CHC and GSMC-Kilgore during the bat removal; and her assessment that patient and safety health were at risk. Ultimately, Ms. Steele believed that CHC had violated state regulations requiring that LMHA's provide services in facilities that are "safe, sanitary, and free from hazards."

18.   Within an hour of Ms. Steele's conversation with Ms. Potter, Brenda Clark, director of nursing for CHC, and Tom Suess called Ms. Steele.  Clark and Suess were furious that Ms. Steele had contacted DSHS.  Clark advised that all state and OSHA guidelines and recommendations had been followed, although Ms. Steele knew that CHC had not been evacuated during the bat removal, no warning signs had been posted about exposure or related illnesses, and the proper procedure in remediating bat guano had likely not been followed, including removal of guano from the ventilation system.

Clark also instructed Ms. Steele not to discuss her symptoms with any of her coworkers.

19. On October 16, 2016, Ms. Steele made a report in the form of a Safety and Health Hazard Notice to the Occupational Safety and Health Administration for the purpose of reporting the apparent work-place safety issue related to likely exposure to *h. capsulatum*. Ms. Steele reported to OSHA the facts related to her persistent symptoms and those of fellow staff members of CHC, her suspicion about exposure to *h. capsulatum* due to bats being in the ventilation system shared between GSMC-Kilgore and CHC; the lack of compliance by CHC of any recommendations published by Centers for Disease Control; the contrast between the actions taken by GSMC-Kilgore and the lack of any action by CHC; the need for patients and staff of CHC to enter and exit through the main hallway connecting CHC and GSMC-Kilgore during the bat removal; and her assessment that patient and safety health were at risk. In response to Ms. Steele's report, OSHA complaint number 30534722 was issued. Among other things, Ms. Steele believed that CHC violated OSHA's mandate that CHC provide her a place of employment that "is free from recognizable hazards that are causing or likely to cause death or serious harm to employees."

20. On or about October 24, 2016, Ms. Steele and other employees of CHC were informed that they would be required to sign an arbitration agreement which would require waiver of Ms. Steele's constitutional right to a jury trial and submit any claims or potential claims against CHC arising out of her employment to private contractual arbitration. It was apparent to Ms. Steele that CHC was maneuvering to a) keep any issue related to their handling of the bat removal and remediation out of the public

eye; and b) seek to limit the rights of Ms. Steele to address what was apparently retaliation for her reports and exercise of free speech. That same day, Ms. Steel advised CHC management that she would not agree to waive her Seventh Amendment right to trial by jury, and submit these very public concerns to a private arbitrator.

21. On November 1, 2016, Ms. Steele was presented with an arbitration agreement as a condition of her continued employment with CHC.  *See Attached Exhibit A.*  In addition to waiver of Ms. Steele's constitutional right to trial by jury, the agreement required Ms. Steele and CHC to share equally in all costs assessed by the arbitrator as well as the arbitrator's fees and expenses from the initiation of an arbitration through final award, which can run into tens of thousands of dollars, thus discouraging the resolution of employee disputes.  Further, the agreement required that Ms. Steele waive the right to participate in any multi-party, class, or collective action against CHC.  Although the arbitration agreement states that "employee desires" to enter into the agreement, Ms. Steel did not participate in the drafting of the arbitration agreement, and in fact refused to sign the agreement.

22. On November 1, 2016, Ms. Steele's employment was terminated with CHC in retaliation for Ms. Steele's exercise of her First Amendment right to free speech, and as a result of reports made to OSHA and Texas DSHS. *See Attached Exhibit B.*  The presentation of an arbitration agreement for Ms. Steele to sign on November 1, 2016, directly following reports made to OSHA and Texas DSHS (and immediate termination of Ms. Steele's employment for refusal to sign said arbitration agreement) constituted retaliation for her reports to OSHA and Texas DSHS, as well as her exercise of speech guaranteed by the 1st Amendment to the U.S. Constitution.

## IV.

## Texas Whistleblower Act Claim

23. Ms. Steele repeats and re-alleges the allegations contained in Paragraphs 1 through 20 as if fully stated here.

24. The Texas Whistleblower Act protects public employees who make good faith reports of violations of law by their employer to appropriate law enforcement authorities. Under the Act, employers may not suspend or terminate the employment of, or take other adverse personnel action against, a reporting employee.

25. Ms. Steele reported, among other things, the violations listed above to OSHA and the Texas Department of State Health Services. Ms. Steele believed that the above-listed activities violated state and/or federal regulations regarding handling and removal or disposal of bats and bat guano. She reported these violations in good faith. And she made his reports to the appropriate law enforcement authorities.

26. As a result of CHC's retaliatory actions, Ms. Steele has suffered and will continue to suffer pecuniary losses, including but not limited to lost wages in the past and future and benefits associated with her employment.

27. Additionally, Ms. Steele has suffered and expects to suffer future pecuniary and non-pecuniary losses, including, but not limited to, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

28. Ms. Steele seeks attorney's fees and costs of suit.

## V.

## First Amendment (Free Speech) Retaliation

## 42 U.S.C. § 1983

29. Ms. Steele repeats and re-alleges the allegations contained in Paragraphs 1 through 20 as if fully stated here.

30. Retaliation by an employer for an employee's speech regarding a matter of public concern is actionable under 42 U.S.C. § 1983.

31. Ms. Steele engaged in constitutionally protected activity – reporting CHC's unsafe handling of the bat guano to DSHS and OSHA. She made these reports to among other things – protect her fellow employees, patients, and the public entering the premises of CHC from exposure to *H. Capsulatem*. As a result of this constitutionally protected activity or, in the alternative, motivated at least in part by the constitutionally protected activity, CHC and White terminated her. CHC's improper and unsafe handling of the building's bat infestation and remediation of disease-carrying bat guano were a matter of public concern, and Ms. Steele's interest in commenting on these practices outweighed CHC's interest in promoting efficiency.

32. As a result of White's individual and official deprivation of Ms. Steele's constitutionally protected rights, Ms. Steele suffered damages. These damages include compensatory damages for lost earnings in the past and future, loss of benefits in the past and future, out of pocket expenses, loss of reputation, and mental anguish.

33. Further, she seeks recovery of her attorney's fees and all recoverable court costs.

## VI.

## Request for Jury Trial

34. Ms. Steele respectfully requests that this matter be tried before a jury.

## VII.

## Prayer for Relief

35. Ms. Steele respectfully requests that she have a judgment against CHC and White awarding her the following damages:

   a. Actual damages;

   b. Compensatory damages in the maximum amount allowed by law;

   c. Prejudgment and post-judgment interest;

   d. Attorney's fees, expert witness fees, and costs of suit; and

   e. Any further legal and equitable relief he is entitled to.

>
> Respectfully submitted,
>
> /s/ *Gregory P. Love*
> Gregory P. Love
> Texas Bar No. 24013060
> **LOVE LAW FIRM**
> P. O. Box 948
> Henderson, Texas 75653
> Telephone: (903) 212-4444
> Facsimile: (903) 392-2267
> greg@lovetrialfirm.com
>
> JUSTIN L. JETER
> SBN: 24012910
> **JETER MELDER, LLP**
> 1111 S. Akard St., Suite 100
> Dallas, Texas 75215
> Telephone: 214.699.4758
> Facsimile: 214.593.3663
> Email: justin@jetermelder.com
>
> **ATTORNEYS FOR PLAINTIFF**